[Civil No. 4519. Filed July 15, 1943.]

[139 Pac. (2d) 766.]

WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY, a corporation, Appellant, v. N. E. VELASQUEZ, FRANCISCA VELASQUEZ, and GENEVIEVE VELASQUEZ, Appellees.

Mr. Thomas W. Nealon, for Appellant.

Messrs. Jennings & Salmon, and Mr. Ozell M. Trask, for Appellees.

STANFORD, J.—This action was brought in the Superior Court of Maricopa County to recover the sum of $1,000 and interest on an insurance policy issued by the appellant to the insured, Herberto M. Velasquez. The policy was written on November 22, 1939, and delivered and accepted by the insured on December 11, 1939. Insured died from active tuberculosis December 24, 1940. Appellant rejected the claim before the action was brought on the grounds that false warranties and material misrepresentations were made in the application for the policy; that the applicant was not in good health when his policy was delivered to him; that the applicant warranted in writing that he was in good health at the time. The case was tried before a jury and the verdict of the jury

was unanimous in favor of the plaintiffs for the sum of $900, allowances having been made for an advancement to appellees of $100 in the matter of defraying funeral expenses.

The issues in this case are: 1. Is the judgment sustained by competent evidence? 2. Did the Court err in refusing to admit in evidence the records of the State Welfare Sanitarium?

The record in the case shows that the insured was, at the time he made his application, twenty-four years of age, and, for several months before the issuance of the insurance policy, he was employed as a musician on Radio Station KOY in Phoenix, playing a cornet or saxophone on the Spanish Hour between six and seven o'clock every morning. His principal work, however, was cleaning and pressing, and he worked every day for eight hours in that business, and very often played for dances. Nothing unusual occurred in his life in the way of illness until about the 25th day of December, 1939, when he apparently had a very bad cold and remained in his bed for several days. On January 6, 1940, he went to the office of Dr. Howell Randolph, in Phoenix, for medical attention. He was not examined at the time he applied for insurance, and his medical history commences with his visit to Dr. Randolph on January 6, 1940.

We will keep in mind that no exceptions were taken to the instructions to the jury, and that the burden was on appellant to prove bad health at the date of delivery of the policy, December 11, 1939. Also, that insured did not seek the insurance policy, but was solicited to have it written by an agent of the appellant. When the application was made, November 22, 1939, insured gave his wife as the beneficiary, but on November 14, 1940, he changed beneficiaries to include his mother.

At the time the insured became stricken, December 25, 1939, more than a month after the application for insurance was made, insured was still working at his trade at a cleaning and pressing establishment in Phoenix, and worked for a full eight hour shift each day. He had been continuously playing, since his application, the cornet or saxophone on the Spanish Hour between six and seven o'clock every morning at the Radio Station KOY; that he had evidently not ceased to play for dances in the evening where he used a saxophone or trombone. No evidence was introduced to the effect that he showed signs of ill health during the time between the making of the application and the 25th day of December, 1939. Dr. Howell Randolph, who, by the evidence showed himself to be eminently qualified, testified as follows:

"Q. Now what is your opinion, Doctor, as to the length of time this tubercular condition had existed, some tubercular condition had existed? A. I think I have already stated the answer to that question in giving a statement regarding the usual length of time which tuberculosis does exist before it becomes evident clinically, and as far as this particular case is concerned, I don't see how I can, as I said before, place it definitely. I would presume that it probably existed more than a month in active, growing tuberculosis, more than a month, probably several months before the film and the fluoroscope was made."

On cross examination he testified as follows:

"Q. Based on the character of work this man had been doing, playing a saxaphone and singing and pressing work in the day time, the fact that he contracted about December 24, 1939, a severe cold which put him to bed, and as a result of which he immediately started coughing, giving that history of the case, which you are assuming is true, isn't it possible, Doctor, that the inception of this tuberculosis might have been as early as December 25, 1939? A. I think it is extremely unlikely.

"Q. But it is possible? A. I think one would have to say it was barely possible.

"Q. Based upon that history you wouldn't set aside that possibility, would you?

"The Court: Wouldn't what?

"Mr. Jennings: Q. Wouldn't set aside that possibility? A. I think that is the only way I can answer, is simply I don't see how—I don't believe it is likely. I don't believe it is likely. I think probably the infection took place some time before and it began to get worse some time before he noticed symptoms.

"Q. That he had the infection some time before and probably this pneumonia activated it to the extent where it became virulent? A. I don't think he had pneumonia. I think he had the beginning of tuberculosis.

"Q. The beginning, that was his illness in December, 1939? A. That is right."

Dr. Eugene A. Gatterdam was called as a witness for the appellees. He also qualified as eminently fitted as one of great experience in the matter of tuberculosis cases and stated in answer to a hypothetical question that clinically active tuberculosis developed the 23rd or 24th of December, 1939, and further testified as follows:

"Q. The 24th when he developed a cold? A. I would say at that time he developed tuberculosis.

"Q. And given those facts, what description would you give as to the type of this tuberculosis? A. It is what we term the galloping or childhood type of tuberculosis.

"Q. The galloping type is, as its name implies, a very rapidly progressing— A. Very rapidly progressing fatal type.

"Q. A virulent type? A. A fatal type.

"Q. And from the disclosures made by the X-ray, could in your opinion that condition develop in the period of two or three weeks? A. It could, yes."

The witness, Joe Rubalcaba, who solicited the application of insurance from the insured, testifed in part, as follows:

". . . . Q. Did you at the time he made the application, at the time you delivered that policy to him, observe what his condition was as to being in good health or otherwise? A. Yes, sir, he seemed to be in good health."

The insured was a patient at the State Welfare Sanitarium near Tempe, Arizona, from February 19, 1940, until his death, December 24, 1940. The appellant offered desired evidence from that institution in the way of records and documents, especially an X-ray taken of the insured. James P. McDougall, then Deputy Commissioner of the State Department of Social Security and Welfare, appeared in the trial court and objected to the production of the evidence on the grounds that under provisions of Chapter 123, Session Laws of 1941, such records were not admissible in evidence, and that the officers of the department were prohibited by this statute from producing the records. When the court denied the admission of the evidence submitted by appellant, counsel for appellant made the statement that he would make an offer of proof at some time during the case, but no such offer of proof was ever made, and at this time we do not see the necessity of entering into the matter raised by the witness, Mr. McDougall, because of the failure of counsel to make the offer of proof.

In this connection we rely on the cases cited by appellees, *Southern Pacific Co.* v. *Richey,* 13 Ariz. 67, 108 Pac. 225, 226. That case, together with others of this state, have repeatedly stated the rule that "This court has repeatedly held that a party who complains of the rejection of evidence must show that he was injured thereby, and that, when a party fails to bring up the evidence upon which such ruling is based, this court will refuse to consider the exception."

We feel that no error was committed by the trial court in prohibiting the use of the records of the State Welfare Sanitarium.

▮ The rule laid down by Mr. Justice Lockwood, late of this court, in the case of *Illinois Bankers' Life Ass'n* v. *Theodore,* 44 Ariz. 160, 34 Pac. (2d) 423, 427, in reference to representations made on the application for insurance policies is the law of our state. We quote as follows:

" . . . We hold, therefore, that under the law of Arizona, a false representation in an application for an insurance policy will not make voidable the policy, unless the insured has been guilty of either legal or actual fraud in making it; that if the question is one where the facts are presumably within the personal knowledge of the insured, and are such that the insurer would naturally have contemplated that his answers represented the actual facts, if the representation be false, the insured is guilty of legal fraud, although as a matter of fact he may not have intended to deceive the insurer; but that where the question is of such a nature that a reasonable man would know that it represented merely the opinion of the insured, there must be an actual intent to deceive and bad faith on the part of the insured."

We cannot think that this logic has, in any way, been interrupted by the case of *Sovereign Camp, W. O. W.* v. *Daniel,* written also by Mr. Chief Justice Lockwood, in 48 Ariz. 479, 62 Pac. (2d) 1144.

▮ The issue raised by conflicting evidence in this case has been settled by the verdict of the jury; there were no questions raised, as stated, about instructions, and we find that the verdict of the jury is based on competent evidence.

The judgment is affirmed.

McALISTER, C. J., and ROSS, J., concur.